CALEB MARKER (SBN 269721)
 Email: caleb.marker@zimmreed.com
ZIMMERMAN REED, LLP
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

JASON P. JOHNSTON (*Pro hac vice* to be filed)
 Email: jason.johnston@zimmreed.com
BRIAN C. GUDMUNDSON (*Pro hac vice* to be filed)
 Email: brian.gudmundson@zimmreed.com
MICHAEL J. LAIRD (*Pro hac vice* to be filed)
 Email: michael.laird@zimmreed.com
ZIMMERMAN REED, LLP
80 South 8th Street, Suite 1100
Minneapolis, MN 55402
(612) 341-0400 Telephone
(612) 341-0844 Facsimile

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID TERPENING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>Defendants. | CASE NO.: 5:21-CV-03739<br><br>**COMPLAINT**<br><br>(CLASS ACTION)<br><br>1. Violation of the Wiretap Act (18 U.S.C. §§ 2511 *et seq.*)<br>2. Violation of the Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86 *et seq.*)<br>3. Violation of the Washington Wiretapping Law (Wash. Rev. Code §§ 9.73.030 *et seq.*)<br><br>(Jury Trial Demanded) |

Plaintiff David Terpening ("Plaintiff") brings this Complaint, individually and on behalf of all others similarly situated, against Defendant Amazon.com, Inc., ("Amazon" or "Defendant"), and alleges upon personal knowledge as to his own actions, and upon information and belief as to counsel's investigations, and on information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      Defendant Amazon is a multinational technology company providing multiple technology products and services, including its eponymous e-commerce marketplace, video-on-demand services and, as pertains to this action, devices and services which make use of its Alexa virtual assistant ("Alexa Devices"). Sales of Amazon's Alexa Devices have exploded in the past five years. In four years—from Alexa's release in 2015 to 2019—Amazon sold over 100 million Alexa Devices. From January 2019 to January 2020, Amazon doubled the sales of Alexa Devices, meaning another 100 million Alexa Devices were sold in just a year.

2.      Amazon represents that its Alexa Devices work by listening for a specific "wake word" such as "Alexa" which, once spoken, triggers the Alexa device or service to listen to users and respond to user commands. What it does not represent, however, is that a "wake word" does not simply trigger Alexa Devices to listen to and respond to commands. Rather, when Alexa hears a "wake word," Amazon initiates a process to create and permanently store recordings of the interaction, including the user's voice, commands, and other sounds, and also captures, among other things, usage data, location data, and other personal information.

3.      Amazon, thus, has millions, of recorded interactions between users and its Alexa Devices. Worse, not all those recordings contain conversations that consumers intend for an Alexa Device to hear. In fact, because Alexa Devices are trained to start recoding when the device *believes* it heard a "wake word," user conversations may be recorded when the Alexa Device misinterprets the user's speech and incorrectly identifies a "wake word" that was not said. Thus, Alexa Devices may be recording conversations regardless of whether the user intended to interact with Alexa at all.

4.      Amazon's recordings often contain highly sensitive information. For instance, even when a user intends to interact with an Alexa Device, the interactions between Alexa Devices and their owners range from the mundane, such as "Alexa, what is the weather like today?" to the deeply personal, such

2

CLASS ACTION COMPLAINT

as "Alexa, what is the number for the suicide hotline?" Mundane or highly personal, Amazon records the conversation to be listened to and analyzed later. Moreover, when an Alexa Device incorrectly identifies a "wake word," it begins recording private conversations that users did not intend for the Alexa Device to hear. Indeed, one news article identified thousands of words that incorrectly trigger smart devices like Alexa to listen and record, including words bearing little familiarity to any "wake word," like "unacceptable," "election," and "a letter."[1] Each time an Alexa Device mistakes a normal word with a "wake word," it records the contents of the ongoing, private conversation. Despite Alexa's built in listening and recording functionalities, Amazon failed to disclose that it makes, stores, analyzes, and uses recordings of these interactions. Amazon, furthermore, failed to disclose that it uses human and artificial intelligence analysts to listen to, interpret, and evaluate these records and otherwise uses these recordings for its own business purposes. Amazon, thus, has a repository of tens of millions of conversations that it maintains and listens to and that is available for Amazon's use.

5.    Amazon misrepresents the extent to which Alexa Devices records user interactions and how Amazon uses them. Amazon markets Alexa Devices as only functioning—*i.e.* listening to and interacting with user speech—upon the intentional use of "wake words." For example, Alexa Devices only "light up" or turn on when users address the Alexa Device with a "wake word" and, similarly, Alexa will only respond to user commands after the user addresses it with a "wake word."

6.    For years, Amazon represented that users "control Alexa with [their] voice" and that those interactions with Alexa were "stream[ed] . . . to the cloud" and were used to "respond to [a user's] requests and improve [Alexa's] services." However, Alexa Devices records activity even, in some cases, when not intentionally addressed with a "wake word" and sends the recording to Amazon, whose artificial intelligence, employees and, upon information and belief, third party contractors freely listen to and analyze its contents and make use thereof for Amazon's business purposes. Amazon never disclosed its widespread creation, storage, and use of those records for its own business purposes that extend beyond improving or personalizing Alexa's services.

---

[1] Dan Goodin, *Uncovered: 1000 phrases that incorrectly trigger Alexa, Siri, and Google Assistant*, ARS Technica (Jul. 1, 2020), https://arstechnica.com/information-technology/2020/07/uncovered-1000-phrases-that-incorrectly-trigger-alexa-siri-and-google-assistant/

7.      Amazon's conduct in surreptitiously recording consumers has violated federal and state wiretapping, privacy, and consumer protection laws.

## THE PARTIES

8.      Plaintiff David Terpening is an adult residing in Glendora, California. Plaintiff purchased and used multiple Alexa Devices since 2016 and was not aware that those Amazon was recording, storing, analyzing, and otherwise utilizing his speech and other sounds for uses beyond responding to the commands and questions he issued to his Alexa Devices.

9.      Defendant Amazon.com, Inc. is a Delaware corporation with its headquarters and principal place of business at 410 Terry Avenue North, Seattle, Washington.

10.     Plaintiff does not know the true names and capacities of the defendants sued herein as DOES 1 through 50 ("DOE Defendants"), inclusive, and therefore sues said DOE Defendants by fictitious names. Plaintiff is informed and believes and based on such information and belief alleges that each of the DOE Defendants are contractually, strictly, negligently, intentionally, vicariously liable and or otherwise legally responsible in some manner for the acts and omissions described herein. Plaintiff will amend this Complaint to set forth the true names and capacities of each DOE Defendant when they are ascertained.

11.     Upon information and belief, Plaintiff alleges that Amazon and DOE Defendants, inclusive, and each of them, are and at all material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as averred herein. Each of the Defendants named herein are believed to, and are alleged to have been acting in concert with, as employee, agent, co-conspirator or member of a joint venture of, each of the other Defendants, and are therefore alleged to be jointly and severally liable for the claims set forth herein, except as otherwise alleged.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2) because at least one Class member is of diverse citizenship from Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest or costs.

13.     This Court has personal jurisdiction over Defendant because they are registered to do business in this State and maintain offices in California. Defendant's subsidiary responsible for Alexa Devices is a2z Development Center, Inc. d/b/a Amazon Lab126 and maintains its headquarters and principal place of business in the state at 1120 Enterprise Way, Sunnyvale, California. A substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this State and Amazon knowingly sold Alexa devices in California.

14.     Venue is proper in this District because Plaintiff resides and suffered injury as a result of Defendant's acts in this District, many of the acts and transactions giving rise to this action occurred in this district, and Defendant conduct substantial business in this district and has intentionally availed itself of the laws and markets of this District. Defendant is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

15.     Amazon is a multinational technology company headquartered in Seattle and primarily known for its e-commerce marketplace which offers various services including, but not limited to selling and shipping products available on Amazon.com, streaming on-demand videos, television shows, and movies through its Prime Video service, and creating and manufacturing devices such as tablets and microphone-equipped smart speakers equipped with Amazon's proprietary voice recognition and artificial intelligence program "Alexa" ("Alexa Devices").

16.     Amazon released its first smart speaker in 2010, which it called "Echo," which has since expanded to numerous other versions of the original Echo products. In 2014, Amazon launched the "Alexa" virtual assistant program which is now integrated with Echo devices and other Alexa Devices. The Alexa virtual assistant operates through Amazon's Alexa Voice Service which uses artificially intelligent voice recognition and natural language comprehension processes to allow consumers to interact with connected devices equipped with a microphone and speaker.

**Alexa Devices**

17.     Alexa Devices are available in various models, including "Echo," "Echo Dot," "Echo Plus," "Echo Sub," "Echo Show," "Echo Input," "Echo Flex," and "Echo Dot Kids" for children. Alexa Devices are microphone-equipped speakers which are marketed as enabling users to interact with the Alexa "virtual assistant" using "wake words" which allows users to issue commands and ask questions

of Alexa. Upon "waking" Alexa, a user may use their voice to tell the Alexa Device to perform one or more of many various functions. For example, users may ask Alexa to play music; control house functions through other smart devices, like thermostats, smart outlets, and smart light bulbs; perform internet-based searches by asking Alexa questions; and, obtain information such as the news and weather. In 2019, over 100 million Alexa Devices had been sold worldwide, with approximately 50 million sales in the United States alone. By 2020, the number of Alexa Devices sold doubled to over 200 million, and sales continue to grow.

18.     A typical Alexa Device consists of, at a minimum, a speaker, microphones, a computer, and the Alexa program itself. Alexa devices also require internet connectivity to operate. Since 2014, Amazon has released more sophisticated Alexa Devices, such as the "Echo Show," that also contain a camera and screen, and has also integrated Alexa into other Amazon products such as Amazon's Kindle e-book readers, Fire tablets, and the Amazon Fire TV media player.

19.     Alexa can also be added to non-Amazon hardware products through a standalone Alexa app (for Apple or Android mobile devices) or when making use of an Amazon program or app on a non-Amazon device such as when using the Kindle app on an iPad or when browsing on Amazon's retail market on a mobile phone.

**Alexa Functionality**

20.     To use Alexa, a consumer must address the Alexa Device using a "wake word" such as "Alexa" or "Echo." The wake word must precede any specific command or question or Alexa will not respond. For example, a user might say "Alexa turn on the lights" or "Alexa play *I Am the Walrus* by the Beatles" or "Alexa, what is the number for the suicide hotline?" Alexa Devices are constantly listening for the "wake word." When Alexa "hears" the "wake word," in addition to attempting to perform the requested function, the device automatically begins audio recording which is, in turn, automatically uploaded to Amazon's Alexa Cloud—a cloud-based data storage and manipulation service. The only way to stop an Alexa Device from "listening" is to turn off the device or unplug it. Since the device is intended to be "hands free" and on "standby" to receive commands and provide information at the convenience of the owner, shutting it off entirely removes the product's function and usefulness.

21.     The Alexa Cloud transcribes a consumer's voice into text and "translates" that text into a language statement comprehensible by the computer known as an "intent." The Alexa Cloud then sends this "intent" back to the Alexa Device, telling it to act on the "intent" using a given functionality known as a "skill." One skill might be playing music, another might be locking or unlocking a smart-lock. In other words, a consumer accesses content or functionality in a "skill" by asking Alexa to invoke one of its "skills" using a speech command. While many "skills" are developed by Amazon (and are available by default), third-party developers are also permitted to develop skills for Alexa, such as to incorporate Alexa voice command functionality into the functionality of a third-party app or smart device.

22.     While Alexa Devices will listen to—and record—speech and other sound indiscriminately, regardless of the speaker, to set up an Alexa Device and use the companion Alexa app a consumer must have a registered Amazon Alexa account and set-up the device by pairing the Alexa Device with the Alexa app on a computer or mobile device. Once set up and paired, the Alexa Device can be used by anyone within speaking range.

**Secret Recordings**

23.     Unbeknownst to users, every interaction between a user and Alexa—including instances where Alexa falsely identifies a "wake word"—is recorded and that recording is sent to Amazon where it stored permanently and reviewed freely by Amazon, its employees, and third parties.

24.     Amazon, however, markets its Alexa Devices as responding to only deliberate interactions (*i.e.* upon the use of a "wake word"), and for years represented that the recordings were "streamed" to the cloud and used only to allow Alexa to respond to the command and to help personalize Alexa's responses to the user.

25.     Amazon failed to disclose to users that it keeps recordings of consumers' interactions, intentional or not, for its own use. These recordings are permanently stored on Defendant's servers and are used by Defendant's employees to train and improve Amazon's artificial intelligence projects and for other business purposes not essential for the functioning of Alexa Devices.

26.     Furthermore, Amazon stores, retains, and analyzes recordings of conversations that users never intended for Alexa to hear. Amazon represents that Alexa Devices only activate upon hearing

CLASS ACTION COMPLAINT

specific "wake words." The devices, however, often activate without a legitimate prompt, including—though not limited to—due to "mishearing" speech as containing the "wake word." For example, if a consumer were to say "I'm going to call Alex and ask him…" Alexa might truncate "Alex" and "and" and "hear" the word "Alexa," causing it to wait for a command and—more importantly—immediately begin the recording. Additionally, the Alexa Device may turn on upon hearing a "wake word" spoken on a television set or on the radio and begin listening and recording. This can lead to the recording and analysis of conversations, speech, and other sounds that are private in nature and not intended for Alexa—or Amazon's—"ears." Thus, not only are Amazon unlawfully and deceptively storing recordings of intentional interactions with Alexa, but also speech and other sounds never intended to be "heard" by Alexa at all.

27.     One article, in fact, found that smart devices like Alexa respond to 1,000 "normal" words that are not supposed to trigger the Alexa Device. For instance, the word "election" turns the Alexa Device on, triggering it to record conversations. Given the frequent media and news coverage of, for instance, the presidential election and that users may discuss the election or election results in their homes, Alexa Devices would be frequently and mistakenly turning on and recording conversations that users would not expect to even be "heard" by Alexa.

28.     Once the recording is made and sent to Amazon, its employees may access and, in addition, identify the location for the device that made the recordings, and other data collected by Alexa Device such as the functionalities used by the owner and any information contained in the recording. This data is also aggregated with data from other sources, such as the user's Amazon shopping history, to create fulsome profiles of information that may include deeply personal and private information that Amazon is able to use for its own business purposes.

29.     Not only does this covert recording, storing, and analyzing of consumer information entail a profound violation of privacy, but given the increasingly all-encompassing scope of Alexa Devices' ability to interface with aspects of a consumer's life (e.g., controlling home security features such as locks and lights, and providing access to personal medical or identity-related information) this storage—unnecessary to the functionality of Alexa Devices—creates a risk from hacking or other unauthorized leveraging of consumer data and processes by third parties (or Amazon personnel).

30.     Amazon personnel fully admitted it failed to clearly disclose to consumers that human analysts would be listening to the recordings created by Alexa Devices for purposes unrelated to Alexa's performance or a personalized response. This is described in an interview with Dave Limp, senior Vice President of Devices and Services at Amazon.com conducted by PBS Frontline for their documentary *Amazon Empire: The Rise and Reign of Jeff Bezos*:

> NARRATOR:
> Once the device is awake and the blue light is on, it's recording. And last year, it was revealed that Amazon employs thousands of people around the world to listen and transcribe some of those recordings to help train the system.
> JAMES JACOBY [Interviewer]:
> Do you think that you did a good enough job of disclosing that to consumers? That there are humans involved in listening to these recordings?
> DAVE LIMP:
> We try to articulate what we're doing with our products as clearly as we can. But if I could go back in time and I could be more clear and the team could be more clear on how we were using human beings to annotate a small percentage of the data, I would, for sure. What I would say, though, is that once we realize that customers didn't clearly understand this, within a couple of days we added an opt-out feature so that customers could turn off annotation if they so chose. And then within a month or two later we allowed people to auto-delete data, which they also asked for within that time frame.
> We're not going to always be perfect, but when we make mistakes, I think the key is that we correct them very quickly on behalf of customers.
> NARRATOR:
> But even one of the founders of Amazon Web Services approaches his Alexa devices with caution.
> JAMES JACOBY:
> When do you turn off your Alexa?
> ROBERT FREDERICK, Former senior manager, Amazon Web Services:
> I turn off my Alexa when I know for a fact that the conversation that I am going to have or whenever I just want to have a private moment. I don't want certain conversations to be heard by humans, conversations that I know for a fact are not things that should be shared, then I actually turn off those particular listening devices.[2]

31.     More than 200 million Amazon smart speaker devices have been sold worldwide, leading to the unauthorized capture, recoding, and storing of millions of private conversations on Defendant's servers. Recorded conversations may include discussions about medications, business deals, banking details, phone numbers, and full names. In addition, Amazon's Echo Dot Kids, which is a smart speaker specifically designed for children, also records and collects transcripts of voice recordings and other user data produced by children. Additionally, Alexa does not distinguish between conversations entered

---

[2] PBS Frontline, *Amazon Empire: The Rise and Reign of Jeff Bezos*, transcript available at https://www.pbs.org/wgbh/frontline/film/amazon-empire/transcript/ (last visited May 14, 2021).

into only by Amazon users, Amazon Prime Members, and Alexa owners and those that involve a speaker who does not have any contractual relationship with Amazon.

32.    Users may opt to set up "voice profiles" for themselves and members of their household. This allows Alexa to identify who is speaking and personalize their experience accordingly. More importantly—for Amazon's purposes—this allows even more sophisticated and thorough individualized data aggregation on Alexa Cloud, helping Amazon to create a robust profile of consumers and their household members which it uses for its own business purposes.

33.    Amazon does not delete its recordings after they have fulfilled their function—i.e. after they have been converted to an "intent" and used to perform a "skill," as Amazon represents. Rather, unknown to consumers, Amazon permanently stores recordings on its own servers. These recordings are then trawled by both artificial intelligence programs and human employees for Amazon's own commercial purposes, including for use in training various Amazon artificial intelligence projects. Upon information and belief, this personal information is also shared with third parties and aggregated with data acquired from third parties to develop a frighteningly robust profile of a given Alexa user.

34.    The only way to stop Defendant from making these recordings is to mute the Alexa Device's microphone or unplug the device, thereby defeating its utility. Further, while Alexa Device users may request that Defendant delete all of the information obtained from a smart speaker device, a user may not stop Defendant from collecting the data in the first place. Amazon only provided users with the ability to delete records in 2019.

**Plaintiff's Experiences**

35.    Plaintiff is an adult citizen of the State of California who purchased and used Alexa Devices, including the "Echo," "Echo Dot," "Echo Show," and "Echo Flex" in the years between 2016 and the present.

36.    Every time Plaintiff used his Alexa Device, Amazon recorded Plaintiff's voice and other sounds and permanently stored those recordings on its servers. It is possible—though known only to Defendant—that Amazon also had Plaintiff's recordings analyzed by either human or artificial intelligence analysts and made other uses of those recordings for its own business purposes.

37.    Plaintiff was unaware at all relevant times that his Alexa Devices were recording and

permanently storing Plaintiff's voice and other sounds, including when the Alexa Device was "awoken" by another individual in the house or in error. Plaintiff was unaware that his voice would be recorded and stored even when speaking at a distance and not intending to speak to Alexa at all. Plaintiff was likewise unaware at all relevant times that the voices and other sounds of other members of Plaintiff's household and Plaintiff's guests would be captured and stored by Amazon as described.

38.     Plaintiff expected his Alexa Device to only "listen" when prompted by the use of the "wake word," and did not expect that recordings would be stored or evaluated by Amazon. These considerations are material to Plaintiff as a reasonable consumer. Had Plaintiff known that Amazon permanently stored and listed to recordings made by its Alexa device, Plaintiff would either have not purchased the Alexa Device or would have demanded to pay less.

## CLASS ALLEGATIONS

39.     Plaintiff brings this action on behalf of himself and all others similarly situated as a class action pursuant to Fed. R. Civ. P. 23 and other applicable rules of civil procedure. Plaintiff seeks to represent the following putative class (the "Class"):

> All adult U.S. citizens who owned and used an Alexa Device or downloaded and used the Alexa app during the Class Period.

40.     The "Class Period" dates back four years (or the length of the longest applicable statute of limitations for any claim asserted) from the date this action was commenced and continues through the present and the date of judgment. Specifically excluded from the Class are: (a) any officers, directors or employees of Defendant; (b) any judge assigned to hear this case (or spouse or immediate family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and (e) any attorneys of record and their employees.

41.     Plaintiff reserves the right to amend or modify the class definition(s) with greater specificity, by further division into subclasses, and/or by limitation to particular issues.

42.     Defendant subjected Plaintiff and Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above is the Defendant's standard business practice.

43.     **Numerosity**. The Class members are so numerous that joinder of each individual class member would be impracticable and unfeasible and likely includes at least tens of millions of individuals who purchased and used an Alexa devices. The individual Class members are ascertainable as the names and addresses of all class members can be identified in the business records maintained by Defendant. Given that over 200 million Alexa Devices have been sold worldwide, with approximately half of those in the United States, the number of Class members is likely in the tens of millions, and can be determined more precisely through discovery. The Class is, however, clearly so large that Class members cannot be consolidated in one complaint and it would be impractical for each to bring suit individually. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

44.     **Commonality and Predominance**. There is a well-defined community of interest among the Class members and common questions of *both* law and fact predominate over questions affecting individual members. These common legal and factual questions include, but are not limited to, the following:

A.      Whether Alexa Devices and the Alexa app recorded the voices and other sounds of people in proximity to them;

B.      Whether Amazon stores such recordings on its servers;

C.      Whether Amazon analyzed or otherwise made use of such recordings;

D.      Whether such analysis included human and/or artificial intelligence analysis;

E.      Whether a reasonable consumer would have purchased an Alexa Devices at the sold price if they were aware that the Alexa Devices were a) recording sounds even when not intentionally addressed; b) permanently storing recorded sounds; c) allowing recorded sounds to be analyzed by human and/or artificial intelligence analysts; d) allowing recorded sounds to be utilized by Amazon for its own business purposes; e) capturing and storing sounds made by other members of the owner's household and guests;

F.      Whether Amazon was required to obtain consent from Alexa Device owners to a) record; b) store; c) analyze; d) make other business uses of, Alexa Device owners' speech and other sounds and those of other members of the Alexa Device owner's household and guests;

G.   Whether Amazon in fact obtained consent from Alexa Device owners to a) record; b) store; c) analyze; d) make other business uses of, Alexa Device owners' speech and other sounds and those of other members of the Alexa Device owner's household and guests.

H.   Whether Alexa Device owners had a reasonable expectation of privacy and confidentiality in the content of their speech and other sounds;

I.   Whether Amazon unlawfully collected and disseminated Alexa Device owners' personal information;

J.   Whether Amazon omitted material facts with regard to the recording, storage, analysis, and use of Alexa Device owners' speech and other sounds;

K.   Whether Amazon made affirmative misrepresentations as to its conduct in recording storage, analysis, and use of Alexa Device owners' speech and other sounds;

L.   Whether Amazon was required to warn Alexa Device owners that their speech and other sounds will be recorded, stored, analyzed and used for Amazon's business purposes;

M.   Whether Amazon did warn Alexa Device owners that their speech and other sounds will be recorded, stored, analyzed and used for Amazon's business purposes;

N.   Whether Alexa Devices recorded speech and other sounds even when not activated by use of a "wake word";

O.   Whether Amazon adequately disclosed to Alexa Device owners that their speech and other sound would be recorded, stored, analyzed, and utilized in the manner described;

P.   Whether the storage and analysis of Alexa Device recordings was necessary for the functionality of those devices;

Q.   Whether Alexa Devices permanently stored or analyzed text, email, and other messages they are instructed to send by consumers;

R.   Whether Amazon's conduct in recording, storing, analyzing, and utilizing Alexa Device owners' speech and other sounds violated the Federal Wiretap Act, 18 U.S.C. §§ 2511, 2520;

S.   Whether Amazon's conduct in recording, storing, analyzing, and utilizing Alexa Device owners' speech notwithstanding its representations that Alexa only begins "listening"

13

upon "hearing" a "wake word" and its omission of the fact that that consumer recordings are stored, analyzed and used for Amazon's business purposes violates the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010 et seq.;

T.   Whether Amazon's conduct in recording, storing, analyzing, and utilizing Alexa Device owners' speech and other sounds violated the Washington wiretapping law Wash. Rev. Code § 9.73.030;

U.   Whether Defendant's conduct was knowing or intentional;

V.   Whether, as a result of Defendant's conduct, Plaintiff and the Class are entitled to damages, including compensatory, statutory, punitive or treble damages and the amount of such damages;

W.   Whether, as a result of Defendant's conduct, Plaintiff and the Class are entitled to equitable relief, such as declaratory or injunctive relief;

45.   **Typicality**. Plaintiff's claims are typical of those of the Class members in that they arise out of the same course of conduct of Defendant. Plaintiff and the Class members each sustained, and will continue to sustain, damages arising from Defendant's common and uniform course of wrongful conduct, as alleged more fully herein. The effort Plaintiff undertakes to pursue their own claims will significantly benefit the Class' members because of the identical nature of the issues across the Class.

46.   **Adequacy of Representation**. Plaintiff will continue to fairly and adequately represent and protect the interests of the members of the Class. Plaintiff shares a common interest with the Class members, with respect to the conduct of the Defendant herein and redress of injury. Plaintiff has suffered an injury-in-fact as a result of the conduct of the Defendant, as alleged herein. Plaintiff has retained counsel who are competent and experienced in the prosecution of complex consumer fraud, mass tort, and class actions. Plaintiff and his counsel intend to prosecute this action vigorously and faithfully for the benefit of the Class members. Plaintiff and Plaintiff's counsel have no interests contrary to the Class members, and will fairly and adequately protect the interests of the Class.

47.   **Community of Interest.** The proposed Class has a well-defined community of interest in the questions of fact and law to be litigated. The common questions of law and fact are predominant with respect to the liability issues, relief issues and anticipated affirmative defenses. The named Plaintiff

14

has claims typical of the Class members.

48.     **Superiority**. The certification of the Class in this action is superior to the litigation of a multitude of cases by members of the putative Class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are members of the Class who are unlikely to join or bring an action due to, among other reasons, their reluctance to spend large sums of time and money to recover what may be a relatively modest individual recovery. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the class members in relationship to the benefits received. The damages and other potential recovery for each individual member of the Class are modest relative to the substantial burden and expense of individual prosecution of these claims. Given the amount of the individual members of the Class' claims, few, if any, members could or would afford to seek legal redress individually for the wrongs complained of herein. Even if the members of the Class themselves could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

49.     In the alternative, the above-referenced Class may be certified because:

a.  The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendant;

b.  The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the Class who are not parties to the adjudications, or which would substantially impair or impede the ability of other members to protect their interests; and,

c.  Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## COUNT ONE

### Violation of the Wiretap Act

### 18 U.S.C. §§ 2510 *et seq.*

50.  Plaintiff incorporates all preceding and succeeding allegations as if fully set forth herein.

51.  Plaintiff brings this claim individually and on behalf of the Class.

52.  The Federal Wiretap Act, 18 U.S.C. § 2510 et seq., prohibits the interception of any wire, oral, or electronic communications. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

53.  "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce…" 18 U.S.C. § 2510(12).

54.  "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

55.  "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

56.  "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6). Plaintiff and the Class are persons as identified by § 2510(6) of the Act.

57.  Alexa Devices are devices for the purposes of the Act because they include software used to intercept electronic communication.

58.  Amazon, through its design, authorship, programming, knowing and intentional installation, activation, and/or other involvement with Alexa Devices and the Alexa virtual assistant has

16

intentionally intercepted, endeavored to intercept, and/or procured others to intercept or endeavor to intercept, electronic communications and described herein, in violation of 18 U.S.C. § 2511(1)(a). This interception was acquired during transmission during the real-time interface between the Alexa Device and the Alexa Cloud and other Amazon services and processes, to acquire the content of Plaintiff and the Class' electronic communications, including their personally identifiable information as described.

59.    The contents intercepted include information concerning the substance, purport, or meaning of that communication, including, but not limited to: dates, times, locations and purpose of appointments and parties thereto; media preferences; dates, times and parties to phone calls and other electronic communications; contents of email, text, and other electronic messages; contents of conversations, the contents of online searches; IP addresses; zip codes; product model numbers; hardware and software versions; region and language settings; contents of media consumed or accessed through or in the presence of an Alexa Device; the contents of a user's "phone book" of contacts; conversations in people's homes; people singing; involuntary sounds; bank details; and full names.

60.    As described herein, Amazon intercepted Plaintiff's and the Class's communications during transmission, simultaneous with their occurrence.

61.    As a result, Plaintiff and the Class have suffered harm and injury, including due to the interception and transmission of private and personal, confidential, and sensitive communications, sounds, content, and data.

62.    Plaintiff and the Class have been damaged by the interception and/or disclosure of their communications in violation of the Wiretap Act, as described herein, and are thus entitled to preliminary, equitable, or declaratory relief; statutory and punitive damages; and reasonable attorneys' fees and litigation costs reasonably incurred. 18 U.S.C. § 2520(b).

## COUNT TWO

### Violation of the Washington Consumer Protection Act

### Wash. Rev. Code §§ 19.86 *et seq*.

63.    Plaintiff incorporates all preceding and succeeding allegations as if fully set forth herein.

64.    Plaintiff brings this claim individually and on behalf of the Class.

65.    The Washington Consumer Protection Act (CPA) prohibits "[u]nfair methods of

17

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

66.      Amazon has committed unfair acts and practices in the conduct of trade or commerce, in violation of RCW 19.86.020, by violating Alexa Device owners' rights to privacy, by storing private information about Alexa Device owners, and by misrepresenting its recording practices to Alexa Device owners, because Amazon misrepresented and omitted that it permanently stored, analyzed, and utilized recordings for its own business purposes. Upon information and belief, Amazon shared its collected data with third parties for profit or other business purposes, which further violates the CPA.

67.      Amazon represents to consumers that its Alexa Devices are simple human-computer interfaces that respond to consumer commands to perform computing functions and omits that it records speech and other sounds of the user and their household, and stores such recordings. Amazon also omits that it has these recordings analyzed by human and artificial intelligence analysts and makes other uses of this data for its own business purposes. Amazon misrepresents to consumers that the only usage of data is to respond to commands and personalize that user's experience, omitting disclosure of the fact that user data—including but not limited to audio recordings—are analyzed and utilized for Amazon's own business purposes not related to a given user's experience of the Amazon Device. Finally, Amazon misrepresents Alexa Devices as only "listening" when intentionally addressed with a "wake word," when in fact Alexa Devices can begin "listening" and recording without being intentionally addressed at all.

68.      Amazon committed its conduct in the context of trade or commerce. Amazon sells its Alexa Devices in interstate commerce in markets across the nation. Additionally, Alexa Device owners can use their Alexa Device to make purchases, including through the Amazon e-commerce marketplace. Additionally, Amazon uses its covert recordings of Alexa Device owners for business purposes affecting interstate commerce, including on information and belief by providing that data to third parties for profit.

69.      The public interest is harmed by Amazon's conduct in recording, storing, analyzing, and utilizing the private speech and other sounds of the citizens of this state who have a fundamental privacy interest in this information. Additionally, to the extent that Amazon uses this data for improvements to its products and services or transmits such data to third parties for profit or other benefit, Amazon is

18

deriving an unfair competitive advantage as a result of its covert recording.

70.     Plaintiff and the Class have been injured by paying more for Alexa Devices than they would have been willing to pay were it fully disclosed that such devices are recording, storing, analyzing and utilizing their private information. Additionally, Plaintiff and the Class have been harmed in their privacy interests through this conduct.

71.     Plaintiff and the Class expected their Alexa Device to only "listen" when prompted by the use of the "wake word," and did not expect that recordings would be stored by Amazon. These considerations are material to Plaintiff and the Class as reasonable consumers. Had Plaintiff and the Class known this, they would either have not purchased the Alexa Device or would have demanded to pay less.

72.     Plaintiff and the Class are entitled to damages and reasonable attorney's fees pursuant to Wash. Rev. Code § 19.86.090.

## COUNT THREE

### Violation of the Washington Wiretapping Law

### Wash. Rev. Code §§ 9.73.030, *et seq.*

73.     Plaintiff incorporates all preceding and succeeding allegations as if fully set forth herein.

74.     Plaintiff brings this claim individually and on behalf of the Class.

75.     Washington law prohibits the interception or recording of a private phone call, in-person conversation, or electronic communication, unless all parties to the communication consent. Wash. Rev. Code § 9.73.030.

76.     Plaintiff and the Class used Alexa Devices in their homes and other private locations.

77.     When Plaintiff and the Class used the Alexa Devices, Amazon recorded speech and other sounds as well as details of the device interactions and stored those recordings on its cloud servers indefinitely.

78.     Amazon conducted analysis using both human and artificial intelligence analysts of these stored recordings and data and made use thereof for their own business purposes.

79.     Plaintiff and the Class had no reason to expect, and did not expect, that Amazon would create permanent recordings of their speech and other sounds and details of their Alexa interactions.

19

80.     Plaintiff and the Class reasonably expected that their speech and other sounds and details of their Alexa interactions would remain private.

81.     Plaintiff and the Class did not consent to their speech and other sounds and details of their Alexa interactions being recorded, stored, analyzed, and made use of by Amazon.

82.     Amazon created, analyzed, and utilized the recordings made of Plaintiff and the Class and the details of their Alexa interactions intentionally.

83.     Amazon's creation of persistent recordings of Plaintiff and the Class's speech and other sounds and details of their Alexa interactions consisted of interception and use of oral and electronic communications without the consent of all parties to those communications, in violation of Wash. Rev. Code § 9.73.030.

84.     Amazon's intentional and unlawful conduct violated Plaintiff and the Class' right to privacy in their confidential communications as protected by Wash. Rev. Code § 9.73.030.

85.     Amazon's intentional and unlawful conduct caused Plaintiff and the Class injury to their dignity, well-being, and security.

86.     Plaintiff individually and on behalf of the Class seeks (1) an injunction requiring Amazon to obtain consent prior to recording Alexa Device interactions, to delete all such recordings already made, and to implement tools and processes sufficient to prevent such unauthorized recordings in the future; (2) damages equal to $100 per day up to $1,000 under Wash. Rev. Code § 9.73.060; (3) costs and reasonable attorney's fees under Wash. Rev. Code § 9.73.060.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all other similarly aggrieved persons, pray for judgment against Defendant as follows:

1.      For an order certifying that the action may be maintained as a class action and appointing Plaintiff and their undersigned counsel to represent the Class in this litigation;

2.      An order appointing Plaintiff as class representative;

3.      An order appointing counsel for Plaintiff as class counsel;

4.      For an order declaring that the acts and practices of Amazon, as set out above, violate the state and federal privacy laws cited herein;

20

5.      Awarding damages, including nominal, statutory, trebly damages, and punitive damages where applicable, to Plaintiff and the Class in an amount to be determined at trial;

6.      For a permanent injunction enjoining Defendant from continuing to harm Plaintiff and members of the Class and the public, and violating Washington law in the manners described above;

7.      An award of reasonable attorneys' fees and costs;

8.      An award of pre- and post-judgment interest, to the extent allowable;

9.      An award of such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

10.     Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial of her claims to the extent authorized by law.

Respectfully submitted,

ZIMMERMAN REED, LLP

Date: May 18, 2021          By:    /s/ Caleb Marker
                                   Caleb Marker
                                   2381 Rosecrans Ave., Suite 328
                                   Manhattan Beach, CA 90245
                                   (877) 500-8780 Telephone
                                   (877) 500-8781 Facsimile

                                   ZIMMERMAN REED, LLP

                                   Jason P. Johnston (*Pro hac vice* to be filed)
                                     Email: jason.johnston@zimmreed.com
                                   Brian C. Gudmundson (*Pro hac vice* to be filed)
                                     Email: brian.gudmundson@zimmreed.com
                                   Michael J. Laird (*Pro hac vice* to be filed)
                                     Email: michael.laird@zimmreed.com
                                   80 South 8th Street, Suite 1100
                                   Minneapolis, MN 55402
                                   (612) 341-0400 Telephone
                                   (612) 341-0844 Facsimile

                                   *Attorneys for Plaintiff*